The COLUMBIA GAS SYSTEM, INC.,
and Subsidiaries, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–167T.

United States Court of Federal Claims.

Oct. 28, 1994.

F. Brook Voght, Washington, DC, for plaintiffs. Thomas C. Martin, A. John Gabig, Elizabeth P. Askey, of counsel.

William K. Drew, with whom were Asst. Atty. Gen., Loretta C. Argrett, Mildred L. Seidman and David Gustafson, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the Tucker Act. 28 U.S.C. § 1491 (1988).[1] Plaintiff seeks interest on tax refunds paid more than forty days after filing applications for tentative carryback adjustment. The Government concedes that the refund for 1982 was untimely but contends that the Internal Revenue Service ("IRS" or "Service") made the refunds for 1980 and 1984 before any obligation to pay interest on them arose.[2] Trial was held on May 9, 1994. After post-trial argument and briefing, the court concludes that interest is due with respect to all three taxable years at issue.

---

1. All subsequent code references will by section number to the Internal Revenue Code extant for the relevant period.

2. In its supplemental brief of May 6, 1994, defendant conceded that although the forty-five day period under § 6611(e) begins to run when a Form 1139 is submitted in processible form, if payment on that form is delayed beyond forty-five days, interest under § 6611(a) accrues from the date when the tax return for the year generating the carryback is filed in processible form. In this case, the relevant return, for 1985, was filed on March 17, 1986.

## BACKGROUND [3]

The facts are largely undisputed, although the parties disagree about their ramifications. At issue are the returns for two corporate entities, Columbia Gas System, Inc. ("CGS") and Commonwealth Natural Resources ("CNR"). CNR was merged into CGS in August 1981, and only its 1980 taxable year is involved here. For the sake of simplicity, the two corporations will be referred to as CGS unless particularity is required.

At issue are refund applications submitted by CGS in 1986 for taxable years 1980, 1982, and 1984. They were precipitated by a net operating loss ("NOL") in 1985. The IRS paid the refund amounts sought, and the correctness of the calculation of those refunds is not disputed here. The question presented by the complaint is whether CGS is entitled to interest because the Government delayed issuing the refunds.

Before CGS sought to claim the carryback of the NOL from 1985, it had reflected on its 1982 Form 1120 the effects of calculating its tax liability pursuant to § 1341, which permits a taxpayer to make adjustments to reflect the return of monies in the current year that were treated in prior years as income under a claim of right ("COR"). Section 1341 requires the taxpayer to perform alternative calculations, set out in paragraphs (a)(4) and (a)(5), to determine which yields the lowest tax liability. Paragraph (a)(4) calculates the tax for the taxable year computed with the deduction of amounts previously included as income under a COR. In the case of CGS's 1982 return, this resulted in reducing taxable income by $13,842,900. Consequently, the tax payable under paragraph (a)(4) was $2,256,147.

Paragraph (a)(5) involves a two-step calculation. It required CGS to determine its tax for 1982 without the COR adjustment and then deduct the decrease in tax for the prior taxable years that would result from excluding the COR income from gross income for those years. The resulting sum operates as a potential dollar-for-dollar reduction of what would otherwise be the tax liability for the current year. In practical terms this sum consists of monies paid in previous years as tax that, in retrospect, did not need to be paid. According to CGS's 1982 return, the § 1341(a)(5) calculation yielded a tax payable of negative $3,758,468 (which represents the tax for 1982 without the COR adjustment, $2,892,920, minus the § 1342(a)(5)(B) deemed payment of tax, $6,651,388). At Schedule J, line 10, and at Form 1120, line 31, CGS reported its "total tax" as "none."

Along with its Form 1120 for 1982, CGS submitted a Form 1139, application for tentative refund, which sought, among other refund amounts, $3,758,468 as an overpayment of tax because of a COR adjustment. The IRS paid CGS that amount.

On May 16, 1983, CGS filed a Form 1139 requesting a refund based on an investment credit carryback from 1982 to 1979. The Philadelphia Service Center's ("PSC") records showed CGS as having a $0 tax liability for 1979, however, and thus the PSC sent a Form 216C letter to CGS on August 8, 1983, disallowing the refund request. Ms. Denise Devine, Manager, System Tax Planning, asked the Wilmington Problem Resolution Office ("PRO") for assistance, noting that the discrepancy between the PSC's records and the Form 1139 with respect to tax liability for 1979 was due to a COR adjustment in that year. The PSC later paid the requested refund with interest, despite the earlier disallowance.

In addition to the return and tentative refund request for 1982, CGS submitted another Form 1139 affecting 1982 in September 1985. This second Form 1139 reflected capital loss carrybacks from 1984 that permitted an additional 1982 refund of $20,987. The amounts shown on the Form 1139 at line 26, "total tax liability," were $2,892,921 before carryback and $2,871,934 after carryback. The IRS did not issue a check for this refund until March 31, 1988. In the Form 1139 for 1982 at issue here, CGS entered $2,871,934

---

**3.** The parties entered into an extensive stipulation covering virtually all relevant background facts. Trial was held on a few disputed points.

as the "before carryback" figure for tax liability.

On March 17, 1986, CGS filed its income tax return for 1985. Accompanying the return were two Form 1139's. One form requested refunds of $2,537,007 for taxable year 1982 and $86,944,238 for taxable year 1984. The refunds at issue were generated by NOL and business credit carrybacks from taxable year 1985. The carrybacks were applied first to 1982. Amounts that could not be absorbed were carried forward to 1984.

When CGS's 1985 NOL was carried back to 1982, investment tax credits of $25,333,883 for that year were released for carryback to 1980. This prompted the second Form 1139, which sought a refund for 1980 of $24,720,732 for CGS and $613,151 for CNR. The Form 1120 for 1985 and the refund applications were filed with the IRS District Director's Office in Wilmington, Delaware.

On April 1, 1986, Mr. Jeffrey Chaess of the PSC telephoned Mr. John T. Fay, then Manager of Tax Administration for CGS, and informed him there were problems with CGS's Form 1139's. Specifically, Mr. Chaess told Mr. Fay that the IRS had no record of CGS's 1984 tax return and that information on the refund requests for 1980 and 1982 did not match IRS records for those years. Mr. Fay explained that CGS had filed its 1984 return on September 16, 1985 and that the apparent discrepancies for 1980 and 1982 were probably caused by § 1341 adjustments in intervening years. Mr. Chaess told Mr. Fay that he would refer CGS's case to his supervisors.

There is no question that the IRS had in fact received the Form 1120 for 1984 by this time. CGS had proof of receipt by the Wilmington District Office and had long since received the $4,845,908 refund requested on the return.

On April 2, 1986, Mr. Fay discussed the matter with Revenue Agent Barry Brody, who was at CGS's offices auditing its returns for related years. They discussed the large amount of money involved. Mr. Brody promptly forwarded the Form 1139's with an explanation to Mr. Anastasia, Case Manager of the audit, in the Examination Division in the Wilmington district. Mr. Brody also recommended that Mr. Fay call the Wilmington PRO.

On April 3, 1986, Mr. Fay contacted the PRO and spoke to Ms. Barbara Abrahms. Ms. Abrahms requested duplicate copies of CGS's Form 1139's, which CGS hand delivered on April 4, 1986. Mr. Fay again spoke to Mr. Chaess on April 15 to inform him that CGS was sending a copy of its 1984 return to the PSC. Mr. Chaess notified Mr. Fay that the IRS had issued a notice of disallowance of the Form 1139's and that CGS could resubmit its Form 1139's after the IRS entered a notice of assessment based on the 1984 return.

The PSC had issued a Form 216C disallowance letter on April 14, 1986. The letter, received by CGS on April 22, referred to a single Form 1139 "for the tax year ended Dec. 31, 1985," and stated that the IRS was returning the form "because we cannot approve it." In giving reasons for the disallowance, however, the letter referred to both forms submitted in 1986:

> The attached form 1139 is disallowed since we have no record of a tax assessment of $2,871,934.00 for Form 1120 filed for the period ending December 31, 1982. We also do not have a Form 1120 filed for the period ended December 31, 1984. When the audit assessment for Form 1120 period ending December 31, 1982 is processed, you may submit the attached Forms 1139.

The disallowance letter made no mention of the refund application for 1980. Both original Form 1139's were returned with the letter, although copies were kept by the PRO.

On April 21, Mr. Fay telephoned the Wilmington PRO and spoke to Ms. Harriett Williams, who told him that CGS's application had been assigned to a special section of the PRO for expedited treatment. Ms. Williams told Mr. Fay that in special cases the PRO could disregard the PSC's notice of disallowance and arrange a refund without an original return. That same day, CGS mailed a second copy of its 1984 return to the PSC. On April 22, after receiving the notice of disallowance, Mr. Fay again called Ms. Williams. She also told him that the PSC had lost the CGS file. Ms. Williams instruct-

ed Mr. Fay to keep the returned original Form 1139's until further notice. On April 30, Ms. Williams told Mr. Fay that once the PSC approved the Form 1139's, CGS would receive its refunds in three or four days.

On May 7, 1986, representatives of CGS met with Ms. Williams and another Wilmington PRO officer, Ms. Landy Blackiston, who explained that the delay up to that point had been caused by the PSC's inability to find any copies of CGS's 1984 return. Mr. Fay handed a third copy of that return to Ms. Williams. In addition, he explained the impact of several adjustments that CGS had previously reported for 1980 and 1982 and offered to discuss the adjustments with any other IRS representatives.

On May 8, the Wilmington District Director's office sent a memorandum to the director of the PSC stating that "[t]he taxpayer has expressed concern because our failure to process the claims in a timely fashion has placed a heavy financial burden upon [it]." Enclosed with the memo were copies of the Form 1139 for 1984 and the first four pages of CGS's 1984 return. (The complete return was 100 pages long.)

For reasons not entirely clear, the PSC then issued a refund of $86,944,238, the amount applied for with respect to 1984.[4] At that time, the Service had not yet processed the Form 1120 for 1984. Mr. Fay picked up the refund check on May 13 and protested that it did not include interest.

On May 28, Mr. Fay called Ms. Williams to inquire about the status of CGS's 1980 and 1982 refunds. Ms. Williams told him that once the 1984 return was posted, the IRS would turn its attention to the other refunds and the 1984 interest. CGS's 1984 return was posted on June 23, 1986. On July 24, 1986, the PSC issued a $1,406,275.41 check for interest on the 1984 refund. CGS received the interest check on July 28. On August 21, the Service paid CGS $40,161.80 of additional interest on the 1984 refund because the PSC had incorrectly computed the interest when it issued the original check.

Thereafter, contacts continued between CGS and IRS personnel, including meetings on September 3 and September 22. Mr. Fay once again asked the PSC to pay CGS refunds for 1980 and 1982. The PSC replied that additional adjustments could not be made because CGS's tax account reflected no reported tax in 1982 and the tax payments for 1980 could not be reconciled with CGS's Form 1139's. As additional reasons that the NOL could not be processed, the PSC asserted that the 1982 return could not be found and that the business credit carrybacks to 1980 could not be released because that tax year was being considered by the Appeals Section. Those objections were short-lived and are not maintained by the Government here. After numerous discussions, the PRO apparently was persuaded that CGS was correct, and it recommended to the PSC that the 1980 and 1982 refunds be made. The PSC, unconvinced, informed CGS that, although the Service had copies of the Form 1139's, it required the original forms. On October 8, 1986, CGS resubmitted both original Form 1139's, a copy of the original March 17 transmittal letter, and a copy of the Form 216C letter to Ms. Blackiston at the PRO. These forms were identical to the forms filed in March.

On October 27, 1986, the Wilmington District Director suggested that the PSC contact Mr. Anastasia for assistance in resolving the problems with CGS's 1980 and 1982 refunds. The PSC did so, and Mr. Anastasia authorized Mr. Brody to review Form 1120's and 1139's for previous years that were relevant to the 1986 Form 1139's.

While Mr. Brody's examination was pending, the Director of the PSC, Joseph Cloonan, wrote the Wilmington District Director a memorandum outlining events in the controversy with CGS. Relevant to the court's consideration are the following comments: "The Form[ ] 1139's for 1979, 1980 and 1982 were rejected as the tax liability figures did not match IRS data. However, 1984 tax period did match and a refund of $86,944,-238.00 was processed." This statement is relevant because it shows the Service was

---

4. Speaking more than a year after the fact, IRS officials explained that the refund was prompted by considerations of hardship and the amount involved.

willing to make a refund for 1984 based on the assumption that CGS previously had paid sufficient taxes to permit a refund.

With respect to the Form 1139 for 1982, the memorandum states: "[T]he refunds were from a claim of right adjustment under Section 1341(b)(1). However, the Form 1139 did not indicate this on line 29, which is provided for claim of right information to be entered upon. Also missing, if this was a claim of right adjustment, was a calculation and schedule as required." This statement begins with an incorrect premise—that the refund was generated by a COR adjustment—and leads to an invalid conclusion—that CGS erred in not completing line 29. A cursory examination of the Form 1139 shows that it was prompted by an NOL carryback of $221,424,709. The attached calculations reflect the NOL carryback, as well as the carryback of unused credits. There is no suggestion that the refund was the result of a current COR adjustment.

On December 15, 1986, Mr. Brody reported his findings at a meeting of IRS personnel at the PSC. During this meeting, Mr. Brody presented six additional Form 1139's that CGS had filed with the IRS in previous years, as well as a schedule that traced the adjustments to CGS's tax liabilities for 1980 and 1982. Mr. Brody concluded that the refunds CGS sought for 1980 and 1982, reported on the Form 1139's at issue, were not reductions in tax, but rather refundable credits generated from tax years prior to 1980 and 1982. It is this briefing that the Government treats as having made the forms processible.

On January 16, 1987, the IRS issued a refund of $613,151 for CNR's 1980 tax year. On January 20, 1987, the IRS refunded $24,-720,732 for CGS's 1980 tax year. Both refunds were received on January 21, 1987, and were without interest.

As of February 2, 1987, the PSC's computer records showed an entry for CGS of $2,892,921, coded as "290." This code reflects "additional tax assessed." Government counsel could neither explain the origin of this entry nor square it with the IRS's position at the time. It is simply inconsistent. The entry is, however, consistent with CGS's

explanation of how its prior filings should have been reflected all along. If the IRS's computer transcript of account had shown an assessment of $2.8 million for CGS at an earlier point, the refund claim would not have generated the same confusion.

Despite the change to the transcript of account, on April 23, 1987, the Director of the PSC sent a memorandum to the Wilmington District Director stating that the PSC still had not processed CGS's 1982 refund because CGS's tax account record for 1982 showed no tax paid or due. On July 24, 1987, Ms. Rita Gumb, the PSC's acting Problem Resolution Officer, notified CGS in writing that the PSC was reversing its payment of $1,446,737 in interest to CGS in 1986 for the 1984 tax year.

During 1987, Mr. Chaess analyzed CGS's 1982 tax account and concluded that CGS had received excessive refunds for 1982 which should offset the requested refund for 1982. At a meeting on September 22, 1987, Mr. Chaess presented his analysis to CGS representatives, including Mr. Fay, and IRS personnel, including Mr. Anastasia and Mr. Brody. Messrs. Anastasia and Brody did not accept that analysis. Finally, on February 24, 1988, the IRS issued CGS's 1982 refund of $2,537,007. CGS received that refund on March 25, 1988, without interest.

The Government concedes that CGS was asked for no additional schedules or materials beyond those furnished with its original refund applications. Moreover, on April 1, 1987, the IRS acknowledged in an internal memorandum that all the "clarification documents" used to compute CGS's refunds had been in the IRS's files when CGS submitted its Form 1139's.

In its opening brief, the Government conceded that CGS is entitled to statutory interest on the 1982 refund of $2,537,007 from December 15, 1986, through February 24, 1988, as well as interest on the interest from February 24, 1988, until the date of payment. This is based on the Service's earlier concession that the claims became processible in December 1986 and that payment on the 1982 taxable year was not made within forty-five days thereafter. Moreover, at trial, al-

though maintaining its position that the Form 1139's were not in processible form until December 15, 1986, the Government conceded that it owes CGS interest on the 1982 refund from the date of overpayment of taxes in this case, March 17, 1986, the date upon which the 1985 return was filed. *See* 26 U.S.C. § 6611(b)(2).

## DISCUSSION

*Applicable provisions of law*

▆▆▆ Under limited circumstances, taxpayers may request tentative tax refunds pursuant to § 6411, rather than initiating their refund request under the standard procedure of § 6402.[5] The advantage to the taxpayer of proceeding under § 6411 is that the Commissioner must act on the refund request (by allowing or disallowing it) within ninety days. Section 6411 directs the IRS to perform a "limited examination" of the application and disallow it if it is found to contain material omissions or calculation errors that cannot be corrected within the ninety day review period. If the Service disallows a tentative refund request, the taxpayer can initiate a refund request under § 6402.

The tentative refund procedure under § 6411 is designed to expedite refunds based on loss carrybacks. As Government counsel stated at trial, the procedure makes expedited refunds possible unless the IRS, after a "quick look over ... the figures, could not verify [the return]." Trial Transcript ("Tr.") at 41. The presumption of § 6411 is in favor of prompt refunds for taxpayers pinched by NOL's. Although § 6411 offers the taxpayer a potentially quicker refund, it has potential drawbacks as well. A disallowance decision under § 6411, unlike a similar decision under § 6402, is not reviewable. Refunds made under § 6411 are also more vulnerable to recapture because, unlike refunds made under § 6402, they may be taken back without notice or a right to contest.

A Form 1139 application for a tentative refund does not, for most purposes, constitute a claim for refund. *See* 26 U.S.C. § 6411(a). The exception is with respect to

interest, which can accrue under § 6611(h) if payment is made late and the claim is in processible form. Consequently, it is important for the taxpayer to know whether the Service has disallowed a tentative refund request. If it has, the taxpayer can then initiate the normal refund procedure.

CGS correctly points out that §§ 6411 and 6611 operate independently of each other. Section 6411 gives certain taxpayers the right to seek an expedited refund, and it creates a presumption in favor of payment. The Commissioner may disallow the claim only if she determines that it cannot be promptly evaluated due to material omissions or calculation errors that cannot be corrected within ninety days.

What is required therefore by statute of all refund requests, including those under § 6411, is use of a permitted form containing the taxpayer's name, address, identifying number, signature, and sufficient information (on the return or on required attachments) to permit the mathematical verification of the tax liability shown on the return. Section 6611 operates more broadly, creating an interest obligation with respect to all qualifying claims for refund. It is in § 6611 that the requirement for "processibility" appears.

*The parties' contentions*

The Government has conceded liability as to interest on the refund claim for the 1982 taxable year. That refund was paid more than forty-five days after December 15, 1986, the earliest date the Government admits a refund claim was filed in processible form. To succeed as to the 1980 taxable year, plaintiff must merely show that its return was in processible form when resubmitted on October 8, 1986, because payment was made more than forty-five days after that date and the October resubmissions were never the subject of a Form 216C letter. The 1984 refund is more problematic because it was paid in advance of the October resubmissions. To succeed as to the 1984 taxable year, CGS must demonstrate that a claim in processible form was filed for that year as of March 17, 1986, the date it filed its return for 1985 and

---

**5.** Section 6411 is available only for taxpayers who report NOL carrybacks, investment tax credit carrybacks, capital loss carrybacks, or § 1341 COR adjustments. § 6411(a), (d).

its accompanying Form 1139 refund request for 1984.

CGS applied for § 6411 refunds for all three years in question on March 17, 1986. The Government's initial argument is that the claims were disallowed pursuant to § 6411(b), as reflected in the Form 216C letter dated April 14, 1986. The Government contends that if the forms were in fact disallowed, the court cannot examine the grounds for disallowance because that decision is unreviewable. 26 C.F.R. § 1.6411–3(c); *see also Rock v. United States,* 279 F.Supp. 96, 99 (S.D.N.Y.1968). Assuming the Government is correct that the forms initially submitted were disallowed, the focus shifts to the October 8 resubmissions. The Government argues that as of that date the applications were still not in processible form. It contends that the problems for all three tax years stem from CGS's use of an inaccurate number for its 1982 tax liability. Because that number was inaccurate and because the three refund claims are interrelated, the Government asserts it was justified in initially disallowing them and refusing to treat them as being in processible form until CGS afforded sufficient explanations and the PSC was briefed on December 15, 1986.

With respect to all three taxable years, CGS has one consistent argument. Relying on the literal language of § 6611, it contends that the disallowance of the refund claims as of April, even if unreviewable, is irrelevant. Under § 6611, when the IRS pays the tentative refund requested in a Form 1139 more than forty-five days after filing, interest attaches, so long as the refund request was in processible form. In this case, the forms were filed on March 17, and the IRS unquestionably paid them more than forty-five days after that date. According to CGS, the Form 216C disallowance letter, issued pursuant to § 6411, has no impact on the mechanical application of § 6611.

In the alternative, CGS argues that the Service did not disallow its refund claims in April. It notes that the Service kept copies of the original forms, continued to consider them, and ultimately made refund payments based on a later resubmission of the identical forms. According to CGS, because the re-

funds were paid more than forty-five days after March 17, interest accrues from the date of tax payment, in this case deemed to be the date of filing of the 1985 return, March 17, 1986.

*Analysis*

Section 6611 creates liability for interest "upon any overpayment in respect of any internal revenue tax." § 6611(a). Such interest "shall be allowed and paid ... [i]n the case of a refund, from the date of the overpayment to the date ... preceding the date of the refund check by not more than 30 days...." § 6611(b). In the present circumstances, the Government has to concede that there were overpayments and corresponding refunds. Thus far it is clear that an interest obligation exists. The Government finds an exception, however, arising from § 6611(e):

(e) **Income Tax Refund Within 45 Days After Return is Filed.**—If any overpayment of tax imposed by subtitle A is refunded within 45 days after the last date prescribed for filing the return of such tax ... or, in case the return is filed after such last date, is refunded within 45 days after the date the return is filed, no interest shall be allowed under subsection (a) on such overpayment.

26 U.S.C. § 6611(e).

The Government fixes the filing date referred to in § 6611(e) as December 15, 1986. CGS puts it at March 17, 1986. The Government's argument has two elements. First, it argues that the refund claims were not in processible form when initially submitted in March or when later resubmitted in October. Consequently, those claims were not "filed" until December 15, the date they were first capable of comprehension by the IRS. Secondly, the Government argues that even if the forms were processible as originally filed, the March filings were disallowed and thus were not "filed" within the meaning of subparagraph (e) until they were resubmitted.

Nonetheless, even if the court accepted the Government's second argument that the March filings were of no effect, the question of processibility as to the October resubmissions remains, because those forms were not

disallowed. The analysis of processibility is identical with respect to the March and October filings, because there was no change in the forms themselves.

Were the applications in processible form?

The 216C letter listed two reasons why the Form 1139's could not be processed. First, the Service Center could not find a copy of CGS's 1984 return. Second, as to 1982, the PSC could not verify the entry on line 26 for CGS's "before carryback" tax liability. The Form 1139 showed a liability of $2,871,934, while a Form 1120 on record at the PSC listed CGS's 1982 "Total tax" at line 31 as "none."

■ Initially, the court holds that a decision to treat CGS's Form 1139 as non-processible cannot be predicated on the IRS's inability to locate copies of the Form 1120's or on its failure to record the tax assessment for 1984. A taxpayer's statutory right to interest cannot be thwarted by problems internal to the agency. If applications were filed in processible form, interest liability would accrue if the refunds were not paid within forty-five days.

Although administrative carelessness was clearly a contributing cause of the PSC's problems with the applications, the court suspects that the primary reason the refunds were delayed had to do with the Service's inability to quickly understand the basis for the returns. It is this factor that the Government primarily relies on now to justify delaying the refund. As of March 1986, the PSC's computer records did not show any tax assessed against CGS for 1982. This is not surprising, considering that the corporation itself showed on its Form 1120 that no tax was due. Consequently, the Government contends that the Form 1139 was erroneous as submitted, because the "tax liability" for 1982 was zero, not $2,871,934.

The Government takes the position that it was not until December 15, 1986, that "the revenue agent presented the necessary information to the Service Center ... so that they could understand the material there, make the corrections that were needed, and then process the returns and make the refunds.... It does not become processible

until the material is gathered, it is presented to the people considering the application, and it is affiliated with them." Tr., at 42. The court is unaware of any "corrections" made to the returns.

Although the court is sympathetic to the Service's initial confusion about the applications, it rejects the Government's characterization of the forms as "inaccurate." The content of the Form 1139's submitted in 1986 never changed. CGS never changed any of the entries, the Service never asked for material it did not already have, and the amounts claimed were ultimately paid. CGS used the correct forms and included its name, address, identification number, and required officer's signature. There are no mathematical errors, and the Government has never contended that the calculations lead to an incorrect refund figure.

As counsel for defendant explained, the assessment and payment of a tax liability creates a de facto "credit" on the computerized transcript of account that the IRS maintains for a given taxpayer. Potential refunds can be taken against the credit. When the Service receives a Form 1139 application for a refund, it typically determines whether there is a "credit" balance against which a refund could be taken. A credit is reflected by an assessment amount, reduced by any subsequent refunds.

Although no running total is maintained, counsel for the Government explained that it would be relatively simple to identify the assessments and refunds and determine whether, on net, the taxpayer had paid as much in tax as it is seeking in the Form 1139. In the present controversy, a superficial examination of the taxpayer's account, without consulting the returns involved, reflected no assessment for 1982 and thus no previously paid taxes against which to allow a refund. This was the case until February 1987, when the plaintiff's transcript of account began showing an assessment of $2.9 million. As circumstances existed in March 1986, it is not surprising that the forms were initially disallowed.

It is understandable that the Service would compare the amount sought in a Form 1139 with the most current assessed amount.

Such a comparison is relevant in refund requests that do not implicate a prior year with a § 1341 adjustment. Counsel for defendant conceded at oral argument, however, that Form 1139 is poorly designed to reflect reality when, in a past year implicated by the refund application, the taxpayer has calculated its tax under § 1341. Section 1341 produces a figure called "the tax for the taxable year computed without such deduction." From this figure is deducted the amount of tax paid in prior years which would not have been paid if the COR income were not included. Plaintiff treats this former figure as the "Total tax liability" sought on Form 1139, line 26. Plaintiff correctly points out that the figure it used is inexorable if lines 12 through 25 of the form are correctly filled in and lines 22 through 25 are added, as the form instructs, to produce line 26.

The Government initially[6] did not contend that any of the data in lines 1 through 25 of the form were incorrect. It maintained that the taxpayer should have known that doing the required calculation would lead to an incorrect figure for tax liability. From plaintiff's perspective, however, the number is not only not incorrect, but indeed is necessary to generate the refund figure, the amount of which the Government does not contest. The maximum amount of CGS's potential refund for 1982 is the tax liability it already paid. After the refunds of $3,758,468 and $20,987 sought in 1983 and 1985, plaintiff's account with the IRS should have shown a tax assessed and paid of $2,871,934. No further amount was due from plaintiff to the Service or vice versa. Therefore, at that point, plaintiff's statement of account should have reflected $2,871,934 as potentially available for refund in the event that changes subsequently were made to the 1982 calculations, due, for example, to carryback adjustments. It is precisely that fact that ultimately persuaded the Service to refund the amounts sought without any change in the Form 1139's and without the submission of any documentation not already available to the Service.

Contrary to the Government's assertion, CGS did not have a "0" balance with the IRS. If that were the case, CGS would have lost the benefit of its payment of $2,871,934 as the "tax for the taxable year." The best evidence of this is that if CGS had put "zero" as its tax liability for 1982, alarm bells would have sounded even without reference to the transcript of account. If CGS had done what the Government suggests was correct as a "matter of law," its account would have shown no credit against which refunds could have been charged. Had this occurred, the Service could have denied the claim for an unassailable reason.

Revenue Ruling 77–344 is consonant with the taxpayer's understanding. In explaining the effect of an NOL carryback to a year in which a § 1341 adjustment has been made, the Service wrote that the tax paid for the year in which the § 1341 adjustment was taken is "deemed reduced" by the "amount of the tax decrease in the year of restoration under section 1341(a)(5) for purposes of determining the amount of tax paid in 1972 available as a refund." This latter calculation—determining the amount of tax payments available as a refund—is precisely the exercise CGS went through in order to assert that its tax liability for 1982, i.e., the amount available for refund, was $2,871,934.

What CGS did in 1986 was also fully consistent with the Service's treatment of its Form 1139 filed in 1983. Under identical circumstances, a refund was made.

During post-trial argument, counsel for the Government explained in detail the IRS's position as to why the tax liability figure for 1982 was "0." The Government contends that the alternative calculations provided in § 1341 ultimately lead to a final figure for tax liability for the year in question. The introduction of taxes paid in preceding years (§ 1341(a)(5)(B)) into the calculation under § 1341(a)(5) is simply part of a mathematical exercise. It is not technically or functionally the equivalent to the movement of taxes paid

---

**6.** During post-trial argument, however, counsel also took the position that the figure for taxable income on the Form 1139's was incorrect and should have been "0," reflecting the effect of the net operating loss carryback. That cannot be the case. The figures in column (a) on the form are pre-carryback.

in previous years to the year at issue. According to defendant, the calculation, employing the taxes previously paid merely as numbers, produces a final tax liability of "0" in the current tax year, 1982.

The number that is produced, of course, is not "0" but <$3,758,468>. More telling is the fact that the IRS concedes that $2,871,934 remained available for refund with respect to the 1982 taxable year, not with respect to the earlier years when the taxes were actually paid. Although the carryback was large enough that it carried further than 1982, the refund of $2,871,934 was with respect to 1982, not some earlier year.

In addition, as the plaintiff points out, the Code does not treat what occurred in 1982 as simply a mathematical exercise for the purpose of calculating current year taxes. Subchapter Q, which contains § 1341, refers to the movement of taxes between the year they were paid and the year in which they are deducted from the "tax for the taxable year" as a "readjustment" of taxes. *See* §§ 1341-48.

This is also clearly demonstrated in § 1341(b). In explaining the use of the decrease in tax ascertained under subsection (a)(5)(B), the provision specifically refers to its deduction from the "tax imposed by this chapter for the taxable year (computed without the deduction)." Moreover, the excess, i.e., the amount available here for potential refund, is to be treated as if it were an "overpayment for such taxable year." This treatment is much more compatible with plaintiff's view that its true tax liability for 1982 was $2,871,934.

It follows that the IRS had no right to treat the forms as non-processable merely because they did not harmonize with its statement of account. The confusion that arose was not caused by any error on the part of CGS in filling in the Form 1120 for 1982 or the Form 1139 for 1982.

The fundamental flaw in the Government's effort to characterize the form as inaccurate is exposed by its contention that they became processible on December 15, 1986, not because of any change in the information provided by CGS, but because that is when the Service finally understood what CGS was claiming. As counsel explained at trial:

> After the returns were resubmitted in October, the IRS had a revenue agent in Wilmington examine the matter. He gathered earlier documents that had been filed and prepared a schedule that traced the various earlier filings, the 1120's and 1139's, and presented that material, the schedule and the underlying documents, to the Service Center personnel on December 15th at a meeting and explained to the personnel how he [t]racked all of these various adjustments that made the—that verified that the bottom line number was correct.

Tr., at 59. It can be readily observed that what made the forms processible was not CGS's correction of its submissions but an epiphany within the PSC.[7] It is noteworthy that someone within the PSC elected to reflect on the computer records for CGS a tax assessed of $2.9 million as of February 2, 1987, a time when the PSC was still unwilling to pay the refund requested for 1982.

The principal difficulty here was that the Form 1139 called for a figure that initially had no direct counterpart on the Service's transcript of account for CGS. The fault for that lies with the Service, not the taxpayer. Nor did the instructions on the back of the form suggest that the taxpayer had to modify the information sought in the event of an NOL that impacted on a prior year involving a COR adjustment. The Government's argument that it was justified in treating the tentative refund application as non-processible due to the lack of a positive tax assessment thus fails because the confusion cannot be laid to CGS.

---

7. During post-trial argument the Government also explained in greater detail how the Service satisfied itself that the bottom line figure for a refund was correct by reconstructing the figures CGS submitted for its § 1341 determination for 1982. The most that can be said for this ap-

proach is that it is another way to produce the same refund CGS sought by filling in the blanks on Form 1139. In other words, the Government possessed the information necessary to make this alternative calculation all along.

During post-trial argument, Government counsel also took the position that the confusion arising from the "inaccurate" entry on line 26 triggered a right in the Service to go even further into its records, in effect to impeach the tentative refund application. There are two difficulties with that contention. First, the records supported CGS's application. The more the Service understood about the prior filings, the more obvious it became that CGS was entitled to a refund. Second, defendant's interpretation does violence to the purpose of § 6411. In that provision, Congress created a presumption in favor of prompt refunds for corporations in years in which they suffered operating losses. Nothing in § 6411, § 6611, or the applicable regulations suggests that the Service had to satisfy itself of the merits of the applications in order to approve the refunds. All that is required for a Form 1139 is that certain minimum information be furnished regarding the corporation and the tax impact of the asserted loss. Because this information must be "mathematically verifiable," the Service is instructed to do a "limited examination." It is not required to examine the previous filings on which the Form 1139 summary calculations are based or attempt to reconcile the form with the transcript of account before making a tentative refund. The only relevant attachment required by the form itself is a calculation of the credit carryback, which CGS did furnish.

The Government's position would make processibility depend in part on the quality of the Service's record keeping and the competence of its employees. Plainly, the test cannot be made subjective in that manner. The Form 1139's were processible at all times.

### Interest on the 1984 refund

Because the court rejects the Government's argument as to processibility, it grants the relief CGS seeks as to 1980 and 1982. The Service paid refunds as to both years more than forty-five days after October 8, 1986, and interest accumulates from March

17, 1986, regardless of whether March 17 or October 8 is used as the filing date for the Form 1139.

It does not follow from this, however, that CGS can recover interest for 1984. Because the company received that refund on May 12, 1986, interest would accumulate only if the March 17, 1986, Form 1139 is treated as "filed" for purposes of § 6611(e) despite the fact that it was the subject of a Form 216C letter. A March 17 filing would place the refund beyond the forty-five day period. If the disallowance nullified the filing, there would be no liability for interest as to the 1984 refund. If, on the other hand, there was no disallowance, the disallowance was found to be irrelevant to the accrual of interest, or the disallowance was overturned by the court, then the Government would fail as to that year as well.

CGS does not contend for the latter possibility, and the court will not assert it on its own motion. The parties appear to agree that the disallowance decision itself is not subject to review. The relevant regulations provide that the disallowance of a tentative refund application "shall be final and may not be challenged in any proceeding." 26 C.F.R. § 1.6411–3(c). The opinion of the district court in *Rock*, 279 F.Supp. at 99, cites the regulatory provision without question. Defendant points to legislative history that supports the agency's construction.[8] This court concurs. The statute makes plain that the decision to allow or disallow is a matter of discretion with the Secretary. *See* 26 U.S.C. § 6411(b).

For CGS to collect interest on $86,944,238 for the period between March 17 and May 12, 1986, the court would have to find that the Form 1139 had not, in fact, been disallowed on April 14, or that a disallowance was immaterial to the accrual of interest.

As to the first possibility, clearly there are many indicators that the Service continued to consider the Form 1139 with respect to 1984 after April 14. There are also indicators that it continued to consider the forms for 1980

---

8. The Commissioner's determination as to whether he can correct any error of computation during the 90–day period shall be conclusive. Similarly, the Commissioner's action in disallowing any application in whole or in part shall be final and may not be challenged in any proceeding.
H.R.Rep. No. 849, 79th Cong. 1st Sess. at 24.

and 1982. Copies were kept, negotiations were ongoing, and the refund for 1984 was made without resubmission of the application. For CGS to succeed on this argument, however, the court must find that the 216C letter was of no effect when issued, or that subsequent consideration of the refund applications vitiated the legal effect of the form. The court declines to do either.

The record suggests the 216C letter was issued with the present intent to disallow the claims. With respect to 1984, the PSC clearly stated that it did not have a Form 1120. Although, as the court has explained, the disallowance was incorrectly premised as a matter of both fact and law, that observation is irrelevant here. When CGS received the letter, there should have been no question that the tentative refund applications were disallowed. To hold otherwise would require the court to find that the letter was cynically issued as an attempt to prevent the running of interest or would involve the court in reviewing the bases of the disallowance. The facts do not support the former finding, and the latter finding is beyond the court's power.

CGS also contends that the Service's conduct after April 14 demonstrates that it was in fact considering the refund applications. Although that contention is unassailable as a matter of fact, its legal significance is more problematic. As the Government correctly points out, the Service can spontaneously decide to refund tax payments, so long as the limitations period has not run. *See* § 6402(a).[9] A formal refund request is not required. The facts suggest that the refund of $86,944,238 with respect to the 1984 Form 1139 came early because Mr. Fay persisted in trying to clear up confusion caused by the Service's misplacement of the 1984 Form 1120 and conveyed to the PRO the urgency of CGS's need for the refund. His explanations and pleas reached comprehending and sympathetic ears within the PRO. The fact that the PSC chose to ignore the decision to disallow the tentative refund requests does not make the earlier disallowance null and void. The taxpayer here simply persuaded the Service to do what it has the power to do, make refunds.

CGS's final argument that disallowance did not affect the accrual of interest is more problematic. In simplest terms, it raises the question of whether disallowance of a refund request under § 6411 means that there was no refund claim "filed" for purposes of § 6611(e). Although the answer is far from self-evident, the court is persuaded that the plaintiff is correct as a matter of law.

It is clear that although there is a linkage between §§ 6411 and 6611, they are fundamentally independent in operation. Section 6411 is a special rule to permit expedited refunds for companies pinched by net operating losses. Although the IRS cannot be forced into granting a refund under such circumstances, if § 6411 is properly invoked, as it was by CGS, the application constitutes a claim for refund. What is unique about § 6411 is that disallowance is non-reviewable. Disallowance, however, does not alter the fact that the application was made. As is often the case in processing a matter through administrative steps, a dispute progresses by the mere act of making a proper request or filing. Further procedural rights may indeed presume agency disallowance.

The most straightforward reading of § 6611 is that the court should focus on the fact of application for a refund and the fact of payment. This approach does not undercut the non-reviewability of disallowance determinations under § 6411. While in typical circumstances the Service's rejection of a claim for expedited refund would force the taxpayer to file a claim under § 6402, the Service elected in this case to continue considering the refund claim without further filing. The taxpayer overpaid its taxes, the Service was on notice of the demand for return, and the refund was paid. Not granting interest under those circumstances would interfere with the intended operation of § 6611.

Accordingly, because March 17, 1986, constitutes the filing date for purposes of deter-

---

9. It is only after the limitations period has run that a claim is mandatory. Treas.Reg. § 301.6402–2.

mining whether the refunds were made within forty-five days, CGS is also entitled to interest on the refund as to 1984.

## CONCLUSION

The effect of the court's ruling is that interest is due from March 17, 1986, until May 12, 1986, on the amount of $86,944,238; from March 17, 1986, until January 16, 1987, on the amount of $613,151; from March 17, 1986, to January 20, 1987, on the amount of $24,720,732; and from March 17, 1986, to February 24, 1988, on the amount of $2,537,-007. The parties are directed to calculate jointly the amount due and file a status report to that effect on or before November 22, 1994.